OPINION OF THE COURT
Joseph Kevin McKay, J.
Introduction
Defendant is the subject of a nine-count indictment charging various violations of article 265 of the Penal Law for unlawful possession of homemade explosive devices and a rifle in his home at 167 North 7th Street, Brooklyn. He has moved to suppress all the contraband to be offered against him at trial on the grounds that it was acquired as a result of a warrantless and unlawful entry, search and seizure at his home.
The prosecution originally opposed the motion by affirming that the search occurred during the execution of a lawful order of eviction against defendant, described as a "squatter” at the premises. This persuaded a previous Justice of this court to deny defendant’s motion summarily, with leave to renew upon "new facts.” After reargument, I ordered an evidentiary hearing, which was conducted over the course of four sessions in November 1992, and consisted of the testimony of a police sergeant, a City Housing Preservation and Development (HPD) manager, an ASPCA agent and the defendant. Based on that record and the posthearing briefs of counsel, the court now renders a decision, embodying findings of fact and conclusions of law which follow.
The Facts
First, it is now undisputed that there never was any court order or warrant of eviction affecting these premises at the time in question, nor did the ASPCA ever obtain any type of warrant or other lawful court order to investigate or prevent *37 cruelty to animals at the premises.[1] What really happened was that the ASPCA received a complaint about mistreatment of a dog at the premises on or about January 28, 1991. During their routine investigation of this complaint, ASPCA agents went to the premises the next day and heard a barking dog. Because no one answered, they interviewed the next door neighbor, the source of the complaint. She identified the occupant, told them that HPD was the owner and that animals roamed in the backyard under foul conditions.
ASPCA’s next move was to contact HPD, request written proof that HPD was the owner of 167 North 7th Street, and insist that HPD grant them access to those premises. The assigned HPD property manager had no keys to the premises and did not believe any HPD official had ever been inside the house. She agreed to cooperate with the ASPCA, however, by providing a letter of City ownership and by meeting the agents at the address on February 4, 1991 to help them gain access. No one took any steps to obtain the occupant’s consent to enter (except by knocking on the door on two occasions), or to seek lawful Criminal or Civil Court authorization to take action.
Defendant actually lived at these premises for most of his life, his parents having purchased the three-story residential building in 1967. The father (also Louis Segna) died in 1979. In 1986 the City acquired title in a tax foreclosure proceeding, and assigned management of the premises to HPD, while defendant and his mother continued to reside there. In or about 1989 the defendant’s mother had to go to a nursing home, leaving the defendant to live alone in the house. He supported himself with assistance from the City’s Department of Social Services, which for a time was making rental payments directly to HPD on his behalf.[2]
On the afternoon of February 4, 1991 HPD personnel met armed, uniformed ASPCA agents in front of the locked premises. No one answered their knocks or yells. ASPCA agents pressured HPD to let them enter forcibly, which was done by *38 breaking the front door lock. Only armed ASPCA agents went inside, equipped with bullet-proof vests.
Once inside, they found a dog in apparently poor health on the first floor, secured it and proceeded to go up the stairs and throughout the premises, looking for any other animals. In the course of the search one or more rifles were seen (all but one were air guns) and what looked like a hand grenade. After notification, a New York City Police Department (NYPD) sergeant from the 94th Precinct arrived and erroneously believed HPD was in the midst of an eviction-type proceeding. The police entered the building and saw rifles, the grenade and what appeared to be explosive materials. The building was evacuated and the bomb squad notified. All the contraband and suspicious materials were removed and later vouchered. Upon his return to the premises later that day, the defendant was identified by a crowd gathered outside and immediately taken into custody for possession of the newly discovered contraband.
The Law
The initial February 4, 1991 warrantless search of the premises was conducted by ASPCA officers who are statutorily recognized "peace officers” (CPL 2.10 [7]). In accordance with that designation, these officers have, inter alla, "[t]he power to carry out warrantless searches whenever such searches are constitutionally permissible and acting pursuant to their special duties.” (CPL 2.20 [1] [c]; see also, People v Smith, 125 Misc 2d 782 [Crim Ct, Bronx County 1984] [where the court suppressed physical evidence seized as a result of a warrant-less search of a defendant’s residence by ASPCA agents and accompanying police officers].)
It is well settled that warrantless searches are per se unreasonable, subject only to a few clearly delineated exceptions, including (1) searches conducted pursuant to consent, and (2) searches based upon "exigent circumstances.” (See, People v Adams, 53 NY2d 1, 7 [1981], cert denied 454 US 854 [1981].) In the instant case the People do not argue "exigent circumstances”. No one involved treated this situation as an emergency until well after the entry and the search had begun. Instead, the prosecution’s justification for this search ultimately rested exclusively upon the so-called proposition that the ASPCA agents, in accordance with People v Adams *39 (supra), could properly rely on the "apparent authority” of the HPD manager of the property to consent to their entry into the building in question. This "proposition” is seriously flawed and the People’s reliance on the Adams decision is wholly misplaced.
The Court of Appeals held in Adams (supra, at 9): "that the police belief [in the apparent capability of an individual to consent to a search] must be reasonable, based upon an objective view of the circumstances present and not upon the subjective good faith of the searching officers.” (Emphasis supplied.) Contrary to the instant case, the facts in Adams show a real emergency. There the defendant fired shots at the police, then fled, and the police were given his name and address by his woman friend on the street. She brought the police to his apartment and let them in with her key to search for specified weapons and ammunition. The Court of Appeals approved this search holding that it was only the exigent circumstances which relieved the police of their normal duty to inquire further regarding actual authority to consent.[3]
Given the defendant’s legitimate relationship to the premises, as well as the lack of exigency, controlling authority regarding this search can be found, not in Adams (supra), but in People v Ponto (103 AD2d 573 [2d Dept 1984]). There, the Second Department stated (supra, at 577): "The prevailing rule in this and a number of other jurisdictions is that the lessor of real or personal property lacks the requisite authority to consent to a warrantless search of the leased property (People v Wood, 31 NY2d 975; People v McNeely, 77 AD2d 205; People v Stadtmore, 52 AD2d 853; People v Mullgrav, 25 AD2d 784 [foreign jurisdiction citations omitted]”). In Ponto, even the use by the landlady of her spare key to defendant’s room was not enough to give her the right to let the police search his room for a gun, which the landlady claimed the defendant *40 had used to threaten her, nor was it enough to justify police reliance on her “apparent authority.”[4]
Although suppression of evidence will not result from a search initiated and performed by a landlord, acting on his own initiative, precisely because of the lack of State action (see, People v McGloin, 161 AD2d 805 [2d Dept 1990], lv denied 76 NY2d 861 [1990]), such cannot be the case where, as here, a governmental landlord is involved with peace officers in an unlawful search. Accordingly, the cases where law enforcement officials reasonably rely upon claims of ownership by interested civilians who consent to a search are also inapposite here. (See, People v Anderson, 146 AD2d 638 [2d Dept 1989], lv denied 74 NY2d 660 [1989]; People v Thomas, 141 AD2d 781 [2d Dept 1988], lv denied 72 NY2d 962 [1988].)
Clearly, any claimed failure on the part of City agencies and peace officers to communicate fully and properly among themselves about this tenancy cannot inure to the prosecution’s benefit to cure an otherwise illegal search and seizure of someone’s home. It cannot cloak HPD with the authority to consent to this warrantless entry, nor can it invest the ASPCA with a right to rely on this newly created “apparent authority” of HPD.
Conclusion
The precise method or sequence of the search conducted first by ASPCA and then by NYPD inside the premises is irrelevant to the legality of the search because it was unlawful ab initia. I conclude that the seizure of all contraband by the police was the direct result of the unlawful entry into and search of the entire premises and must be suppressed as the fruits of such illegality. Accordingly, the defendant’s motion to suppress all physical evidence seized is hereby granted.

. See, Agriculture and Markets Law § 372, which provides for the issuance of warrants, upon sworn application to a criminal court, to search and arrest for violations of the laws against cruelty to animals; see also, People v Linder, 156 Misc 2d 417 (Crim Ct, Richmond County).

. Clearly, the defendant’s demonstrated long-term relationship to the premises could only have been lawfully terminated by his consensual act or by a judgment of a court of competent jurisdiction. (See generally, RPAPL 711, 713.)

. The majority of the "apparent authority” cases which cite Adams (supra) involve situations where the person giving consent has some relationship with the defendant or connection with the premises searched. (See generally, People v Thomas, 175 AD2d 188 [2d Dept 1991], lv denied 79 NY2d 865 [1992] [consent by defendant’s sister who lived with him]; People v Teage, 173 AD2d 878 [2d Dept 1991], lv denied 78 NY2d 1081 [1991] [consent by an employee left in charge of a service station]; People v Adames, 168 AD2d 623 [2d Dept 1990]; People v Mills, 159 AD2d 520 [2d Dept 1990], lv denied 76 NY2d 739 [1990] [consent by occupants of an apartment]; People v George, 150 AD2d 486 [2d Dept 1989], lv denied 74 NY2d 809 [1989] [consent by defendant’s wife]; People v Snow, 128 AD2d 564 [2d Dept 1987] [daughter of boarding house owner may consent to search of common area].)

. Not even a civil eviction warrant (the prosecution’s original, but erroneous reason for this search) would cause a tenant to forfeit all reasonable expectations of privacy in leased premises, nor can the eviction process be converted into a warrant for a general search of such premises. (People v Ponto, supra, at 577; People v Stadtmore, 52 AD2d 853 [2d Dept 1976] supra; but see, People v Davis, 169 AD2d 16 [2d Dept 1991], lv denied 79 NY2d 826 [1991], clarifying and limiting defendant’s expectation of privacy during eviction.)